IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION



**FILED**

JUN 1 7 2026

CLERK, U.S. DISTRICT COURT
TEXAS EASTERN

| | | |
|---|---|---|
| ROBERT STAFFORD, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 4:25-cv-00921-JDK-JDL |
| | § | |
| TRANS UNION, LLC, and EQUIFAX | § | |
| INFORMATION SERVICES LLC, | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT TRANS UNION, LLC'S MOTION TO ENFORCE SETTLEMENT AGREEMENT**

Plaintiff Robert Stafford, appearing *pro se*, respectfully files this Response in Opposition to Defendant Trans Union, LLC's ("Trans Union") Motion to Enforce Settlement Agreement. Plaintiff requests that this Court deny Defendant's Motion in its entirety. Defendant's motion is a procedurally coercive document, built upon a non-existent, unexecuted, and structurally defective contract draft that lacked a mutual meeting of the minds. It represents a bad-faith attempt to utilize the Court's administrative processes to strip a *pro se* consumer litigant of critical statutory rights. In support thereof, Plaintiff respectfully shows the Court as follows:

## I. INTRODUCTION & SUMMARY OF ARGUMENT

This discovery and settlement dispute is an artificial crisis engineered by defense counsel to shield Trans Union from impending exposure for severe discovery violations and to cover up an administrative misrepresentation made to the Court Clerk.

On May 26, 2026, the parties reached a baseline agreement *in principle* on four narrow, essential terms. However, Plaintiff explicitly, in writing, conditioned any final, binding contract upon his future personal review and physical execution of the formal contract text. While Plaintiff was

1

traveling and unable to safely read or access any attached documents, defense counsel transmitted a draft agreement containing unnegotiated, sweeping "poison pills"—specifically, a broad prospective waiver of future statutory rights under 15 U.S.C. § 1681i, an illusory subpoena compliance clause, and hidden provisions designed to obstruct Plaintiff's active litigation path against remaining co-defendants and underlying data furnishers.

Realizing he had a baseline deal in principle, but before Plaintiff had ever seen, reviewed, or signed a single syllable of the actual contract text, defense counsel unilaterally emailed the Court Clerk at 5:03 PM on May 26th to cancel an impending judicial discovery conference. When Plaintiff reviewed the text the next morning and submitted legitimate, good-faith written objections to the surprise boilerplate at 7:59 AM, defense counsel panicked. To retroactively justify his premature and unauthorized cancellation of the Court's calendar, counsel weaponized an aggressive, uncalled-for 11:00 AM ultimatum, threatening immediate sanctions to force Plaintiff into executing a non-conforming, toxic agreement.

To demonstrate absolute good faith, Plaintiff drafted, signed, and formally delivered a completely pristine, conforming settlement agreement matching the four agreed-upon points exactly, alongside a completed IRS W-9 form. Defendant flatly refused to sign it, standing in active repudiation of the actual agreement in principle. Defendant cannot seek to enforce a contract that Plaintiff explicitly rejected, which contains unnegotiated terms that violate Plaintiff's express conditions precedent, while simultaneously refusing to execute the very document that reflects the true agreement of the parties.

## II. PROCEDURAL AND FACTUAL BACKGROUND

### A. Defendant's Abusive Discovery Tactics and the Resulting Judicial Intervention .

2

This dispute arises out of Trans Union's persistent refusal to comply with its federal discovery obligations. On May 20, 2026, defense counsel demanded a two-hour interactive meet-and-confer session regarding outstanding discovery items. Plaintiff participated fully in this 2 way exhaustive session which Defence councle weaponized. Despite the enormous length of this conference—which is highly abnormal and disproportionate for a single-plaintiff consumer Fair Credit Reporting Act (FCRA) action—defense counsel immediately demanded *another* two-hour verbal marathon for the very next day, May 21, 2026.

On May 21st, Plaintiff object to this second multi-hour verbal session as an aggressive, repetitive, and abusive waste of party resources, noting that the positions were fully defined. In response, defense counsel engaged in heavy-handed posturing, threatening to immediately call the Court's Discovery Hotline to seek sanctions against the *pro se* Plaintiff. Left with no meaningful resource, Plaintiff agreed to the session. Later that same day, realizing the deep impasse created by Trans Union's non-compliance and unusual leangthy meet and confer, Magistrate Judge Hawthorn formally intervened, scheduling a judicial discovery conference for the following Wednesday, May 27, 2026, and strongly suggesting that the parties exhaust all avenues to work out their disputes prior to that setting.

## B. Plaintiff Exposes Trans Union's Flagrant Discovery Violations

In strict deference to Judge Hawthorn's directives, Plaintiff immediately submitted a comprehensive list of discovery deficiencies to Trans Union on May 22, 2026 (Exhibit G). Plaintiff's disclosure unmasked multiple flagrant violations by Trans Union, including:

- The extensive and improper deployment of compound question objections, a practice heavily disfavored and restricted under established federal parameters; and

3

- A unilateral, unauthorized restriction of a legally valid six-year statutory discovery window down to a mere 60 days, executed without ever seeking or obtaining a protective order from this Court under Federal Rule of Civil Procedure 26(c).

Faced with an impending judicial hearing on May 27th, defense counsel sought to avoid judicial scrutiny of Trans Union's severe, un-remedied discovery deficiencies—which exposed the company to potential judicial sanctions and an order compelling the immediate production of raw corporate data—by initiating urgent settlement communications

## C. The High-Pressure Negotiations of May 25–26

Desperate to avoid the May 27th hearing, Defence Counsel initiated intense settlement communications. On Monday, May 25, 2026, Defendant rejected an initial settlement proposal from Plaintiff. Plaintiff immediately responded with a formal counteroffer consisting of four strictly interdependent parameters (Exhibit E):

1. **Monetary Compensation:** Trans Union to pay a lump sum of $10,000.00.

2. **Credit File Correction:** Immediate deletion of the specific disputed accounts referenced in the Complaint.

3. **Production of Native Logs:** Trans Union must produce the native Metro 2 data strings and automated credit dispute verification (ACDV) communication logs associated with Plaintiff's file from January 1, 2020, to the present. (Due to the fact that at the 26f conference in April. Defence Counsels for both TransUnion and Equifax blamed the banks for the missing and incorrect information in front of Magistrate Judge Love)

4. **Litigation Carve-Out:** An explicit, uncompromised carve-out preserving 100% of Plaintiff's rights to litigate against all other co-defendants and data furnishers (the banks).

4

On the afternoon of Tuesday, May 26, 2026, the parties verbally negotiated these numbers down into a refined four-point agreement *in principle*, adjusting the principal sum to $4,000.00 while strictly maintaining the remaining credit corrections, data subpoena access, and litigation carve-outs.

**D. Plaintiff's Explicit Written Conditions Precedent to Contract Formation**

At 3:45 PM on May 26, 2026, Plaintiff transmitted an email confirming the baseline parameters of the negotiation. Crucially, Plaintiff was on the road driving, actively traveling, and completely unable to read, open, or examine any electronic document or attached PDF (Exhibit H). Because Plaintiff could not see or verify any formal contract text, he explicitly inserted two absolute conditions precedent into the body of the email:

**First Condition Precedent:** *"Please send over the draft of the Confidential Settlement and Release Agreement as soon as possible so that I can personally review the specific contract language."* This statement serves as objective, irrefutable proof that Plaintiff did not see, possess, or review any attached PDF contract. Had the contract been open and accepted on the screen before him, a request to transmit the draft for review would be entirely redundant.

**Second Condition Precedent:** *"Once I review the contract text and verify that the language strictly reflects these terms, I will gladly sign and work with you to execute the joint paperwork to cancel tomorrow's conference with Judge Hawthorn as well as the upcoming deposition."* This text left no room for ambiguity: Plaintiff was not executing a final contract in the blind. He explicitly preserved his absolute right to review the fine print to ensure it conformed strictly to the four baseline points, making physical execution the sole mechanism of contract formation. Furthermore, in the third paragraph of that exact same transmission, Plaintiff erected an unyielding boundary regarding the scope of the release:

5

**The Express Release Parameter:** *"The contract must isolate Trans Union completely so that my ongoing litigation and discovery path against Equifax and the underlying data furnishers remains entirely unobstructed."*

**E. Defendant's Hidden "Poison Pills" and the Fraudulent Clerk Cancellation**

Defying Plaintiff's explicit instructions, defense counsel transmitted a PDF draft that did not merely record the four points; it buried sweeping, toxic corporate protections into the unnegotiated boilerplate. Most egregiously, the draft contained hidden provisions that actively obstructed Plaintiff's ability to pursue the underlying data furnishers (the banks) and remaining co-defendants, directly violating Plaintiff's express written mandate. It also contained an entirely blank "Exhibit A" credit disclosure (Exhibit A) and an *illusory promise* regarding subpoena compliance, stating Trans Union would respond to a post-dismissal subpoena *"without waiving any objections."* In legal reality, this double-negative reserved Trans Union's absolute right to object to every line item and produce zero bytes of data after dismissal.

Knowing that his draft did not conform to Plaintiff's conditions, and before Plaintiff had ever opened, read, or signed the document, defense counsel engaged in highly irregular conduct. At 5:03 PM on May 26th, counsel unilaterally emailed the Court Clerk to cancel the next day's judicial conference, representing to the tribunal that the entire case was being resolved.

When Plaintiff arrived at his destination, opened the draft text, and discovered the hidden obstruction clauses and blank placeholders, he acted immediately. At 7:59 AM on Wednesday, May 27th, Plaintiff delivered detailed, good-faith written objections to the non-conforming boilerplate text (Exhibit I).

Realizing he had caught himself in a trap—having reported a finalized settlement to the Court Clerk at 5:03 PM when no meeting of the minds actually existed—defense counsel resorted to

6

immediate procedural coercion. At 11:00 AM (Exhibit B and Exhibit J), counsel sent a revised draft and issued an aggressive, uncalled-for three-hour ultimatum: sign the contract instantly or face an immediate motion to enforce and heavy court sanctions. This timeline demonstrates that the threat of sanctions was entirely manufactured by defense counsel to force a *pro se* litigant into signing away vital statutory rights, all to cover up counsel's premature and unauthorized cancellation of a federal court setting.

**F. Plaintiff Fully Performs; Defendant Repudiates the Real Deal**

To separate the unnegotiated boilerplate from the true agreement, Plaintiff took immediate action. On May 28, 2026, Plaintiff drafted, signed, and formally delivered to defense counsel a fully executed *Confidential Settlement and Release Agreement* alongside a completed 2026 IRS W-9 form (Exhibit C and Exhibit L).

Plaintiff's executed contract strictly embodied and fulfilled every single essential term negotiated on May 26th: the $4,000.00 payment, the 9 account deletions, a 100% clean litigation carve-out leaving claims against data furnishers unobstructed, and an ironclad commitment to comply with a Rule 45 subpoena for the raw data strings. Plaintiff retained 100% of Trans Union's standard, negotiated corporate protections word-for-word. Trans Union, however, flatly refused to sign this conforming contract. Instead, counsel filed the present Motion to Enforce (Exhibit K Exhibit M Exhibit N Exhibit O, seeking to legally compel Plaintiff to accept unnegotiated terms that he had explicitly and consistently rejected.

## III. LEGAL ARGUMENT AND AUTHORITIES

**A. No Enforceable Contract Exists Because Mutual Assent Was Explicitly Conditioned Upon Future Review and Execution of the Document Text**

7

Under Texas law, which governs the enforcement of settlement agreements in this diversity action, a contract cannot exist without a complete "meeting of the minds" on all essential terms. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992). Furthermore, where parties demonstrate an intent that an agreement is conditioned upon the future review and execution of a formal written document, no binding contract arises until that condition is strictly satisfied. *Foreca, S.A. v. GRD Dev. Co.*, 758 S.W.2d 744, 746 (Tex. 1988); *Hardman v. Dault*, 2 S.W.3d 378, 380 (Tex. App.—San Antonio 1999, no pet.).

The paper trail leaves no room for judicial interpretation. Plaintiff's May 26th email explicitly stated: *"Once I review the contract text and verify that the language strictly reflects these terms, I will gladly sign..."* This language establishes an unambiguous condition precedent. Because Plaintiff was driving, he could not see the PDF contract; he explicitly reserved assent until he could personally inspect the fine print. An "agreement to agree" on a future contract, where material terms remain subject to approval, is legally unenforceable as a matter of law. *Radford v. McNeny*, 104 S.W.2d 472, 474 (Tex. 1937). Because Plaintiff never signed Defendant's non-conforming draft, the condition precedent failed, and no contract ever formed.

**B. Defendant's Non-Conforming Draft Contained "Poison Pills" That Directly Violated Plaintiff's Express Written Release Parameters**

Under Texas law, for an agreement to form, the acceptance must be a "mirror image" of the offer, meeting on the exact same terms in the exact same sense. *Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 514 (Tex. 2014). It is well settled that if a purported acceptance modifies the terms of the offer or adds new material ones, it does not form a contract; instead, it operates as a counter-proposal, leaving the parties with no meeting of the minds. *United Concrete Pipe Corp. v. Spin-Line Co.*, 430 S.W.2d 360, 364 (Tex. 1968). Plaintiff made it

8

an unyielding, written condition precedent that his discovery and litigation path against Equifax and the underlying data furnishers (the banks) must remain "entirely unobstructed."

Defendant's draft directly violated this requirement by hiding provisions that legally paralyzed Plaintiff's ability to pull records from, depose, or litigate against the underlying banks. Additionally, Defendant attempted to insert the phrase "without waiving any objections" next to its promise to respond to a third-party subpoena. Under Texas law, a promise is completely illusory when the promisor retains an unbridled, unilateral right to escape performance. *In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex. 2010). By reserving the right to object to the very subpoena it promised to answer, Trans Union bound itself to absolutely nothing. Plaintiff caught this deceptive framing during his review, flagged it as an illusory trap, and rejected it. A party cannot use a Motion to Enforce to legally force an opponent to accept material terms that were never part of the verbal or email exchange.

.

### C. Plaintiff Fully Tendered Performance, and Defendant Repudiated the Baseline Agreement in Principle

If a valid, binding agreement in principle was formed on May 26th as Defendant's motion asserts, it is **Defendant Trans Union**—not the *pro se* Plaintiff—that stands in material breach and active violation of that agreement.

Under Texas law, a party commits an anticipatory breach or repudiation of a contract when it absolutely refuses to perform its contractual obligations unless the other party consents to completely unnegotiated, un-bargained-for modifications. *Binswanger Glass Co. v. Harris*, 493 S.W.2d 648, 650 (Tex. Civ. App.—Houston [14th Dist.] 1973, no writ).

9

On May 28, 2026, Plaintiff fully performed and tendered complete compliance with the parties' baseline four-point deal. Plaintiff drafted, executed, and formally delivered to defense counsel a clean, pristine *Confidential Settlement and Release Agreement* alongside a completed IRS W-9 form (Exhibit C). Plaintiff's contract preserved every single corporate protection Trans Union originally asked for, but cleanly excised the unnegotiated poison pills, ensuring the path against the banks remained unobstructed. Trans Union flatly refused to sign this conforming contract. Trans Union cannot legally argue that a settlement is valid and enforceable while simultaneously refusing to sign the only document that strictly reflects the actual negotiated terms.

**D. Defendant's Motion is a Bad-Faith Abuse of the Court's Administrative Process to Cover Up Counsel's Deceptive Timelines**

The entire timeline of this motion exposes a severe pattern of "sharp practice"—using technical legal mechanisms to overwhelm and deceive a *pro se* opponent. Defense counsel unilaterally contacted the Court Clerk at 5:03 PM on May 26th to wipe a mandatory discovery hearing off the Judge's calendar, falsely representing that the case was settled before Plaintiff had even opened the contract files.

When Plaintiff exposed the non-conforming fine print at 7:59 AM the next morning (Exhibit I), counsel realized he had misled the Court Clerk. To cover his own administrative error, counsel weaponized the 11:00 AM threat, trying to scare a non-lawyer with immediate sanctions unless he signed away his federal statutory rights within hours. When that intimidation failed, defense counsel sent a retaliatory email on June 16, 2026 (Exhibit P), threatening to seek thousands of dollars in attorney's fees against Plaintiff for continuing to push his valid Motion to Compel, falsely claiming the motion was "moot" due to a "Party settlement." This behavior is an attempt to "chill" and freeze Plaintiff's participation in this lawsuit. This Court should not tolerate the use

10

of its docket to legitimize defensive maneuvers born out of counsel's own misrepresentations to the Court Clerk (Exhibit P).

**IV. Response to Defendant's Improper Character Evidence and Footnote 2 Smear Tactics**

In Footnote 2 on Page 1 of its Motion, Defendant engages in an improper, bad-faith attempt at character assassination by introducing unrelated public dockets of Plaintiff's prior state court filings. Trans Union cites *E.E.O.C. v. Simbaki, Ltd.*, 767 F.3d 475 (5th Cir. 2014) in an attempt to prejudice this Court into believing that Plaintiff is an overly sophisticated litigator who should be stripped of the standard leniency afforded to unrepresented parties. This argument is a legally frivolous distraction.

First, under Federal Rule of Evidence 404, a private citizen's prior enforcement of consumer protection laws in entirely separate state forums has **absolute zero legal relevance** to whether mutual assent was achieved regarding unnegotiated, toxic boilerplate in *this* completely unrelated.

 Second, and most egregiously, defense counsel deliberately misleads this Court regarding the nature of those prior matters. Every single one of the cases cited by Defendant was filed exclusively in the Texas Justice of the Peace Court for small-claims TCPA violations. Under Texas Rule of Civil Procedure 500.3, Justice Courts are informal forums where the formal Rules of Evidence and Civil Procedure do not even apply. Prior to this action and a companion consumer case filed nearly concurrently, Plaintiff had never filed a lawsuit or appeared in a United States District Court. Plaintiff remains completely new to the federal judiciary, is highly unfamiliar with its complex procedures, but is actively studying and striving to learn how to properly navigate the system. To cite informal, small-claims robocall disputes to convince a Federal District Judge that an unrepresented consumer is a seasoned federal litigator is a flagrant

11

distortion of reality. Plaintiff is a true pro se litigant and is fully entitled to the standard leniency afforded by law.

Third, Plaintiff *is* strictly abiding by the rules of this Court—it is Plaintiff who has actually executed and formally tendered a clean contract that perfectly captures the parties' true 4-point agreement. Conversely, it is defense counsel who violated the rules of professional candor by prematurely misrepresenting the status of litigation to the Court Clerk at 5:03 PM on May 26th before any written agreement existed, and then using his own administrative error to threaten a *pro se* consumer with sanctions. Trans Union's reliance on irrelevant small-claims dockets reveals the total substantive bankruptcy of its motion; if its contract law argument had merit, it would not need to resort to mudslinging.

## V. Defendant's 'Incorporation by Reference' Theory Fails as a Matter of Law

Defendant relies heavily on *Sierra Frac Sand, L.L.C. v. CDE Glob. Ltd.*, 960 F.3d 200, 203 (5th Cir. 2020) to argue that Plaintiff's May 26th acceptance email 'incorporated by reference' Trans Union's entire unsigned corporate boilerplate draft. This is a profound mischaracterization of Texas contract law. Under *Sierra Frac Sand*, an external document is only incorporated into a signed writing if the text contains a clear, unequivocal, and explicit expression of intent to adopt the entirety of that external document *in toto*.

Here, Plaintiff's May 26th email explicitly limited the scope of acceptance to four narrow, baseline essential terms: (1) a $4,000 principal payment, (2) the complete deletion of the 9 disputed tradelines, (3) a 100% litigation carve-out, and (4) an express commitment to respond to a Rule 45 subpoena. Far from expressing an intent to blindly adopt Trans Union's unreviewed corporate clauses, Plaintiff's email explicitly stated: *'Please send over the draft of the*

*Confidential Settlement and Release Agreement as soon as possible so that I can personally review the specific contract language.'*

Under settled Texas law, a party cannot be deemed to have mutually assented to or 'incorporated by reference' hidden, toxic clauses (such as a prospective waiver of future statutory rights or a permanent gag order) when that party explicitly reserves the right to review the specific contract text before execution. The defense's attempt to use *Sierra Frac Sand* to force an unnegotiated contract onto an unrepresented party is legally untenable.

## VI. No Meeting of the Minds Occurred on Substantive, Material Terms

In this case, Trans Union did not merely record the release of its own historical liability; it secretly inserted a permanent gag order under Section II, Paragraph L that directly eviscerates the negotiated "100% litigation carve-out." The exact, word-for-word text of Paragraph L in Defendant's final non-conforming draft states:

*"L. Plaintiff agrees that the terms of this Agreement and **any alleged unlawful conduct by Trans Union are confidential. Plaintiff shall not disclose the terms of this Agreement or any alleged unlawful conduct by Trans Union to any person or entity**, except confidentially to Plaintiff's spouse, an attorney for purposes of obtaining legal advice, an accountant or tax professional for purposes of obtaining tax advice, the IRS, or upon order of the Court after written notice to Trans Union and an opportunity to be heard."*

This text directly violates the express conditional parameters Plaintiff established in writing. Plaintiff's baseline email explicitly mandated: *"The contract must isolate Trans Union completely so that my ongoing litigation and discovery path against Equifax and the underlying data furnishers remains entirely unobstructed."* > By explicitly forcing a requirement that **"any alleged unlawful conduct by Trans Union are confidential"** and that Plaintiff **"shall not**

13

**disclose... any alleged unlawful conduct by Trans Union to any person or entity,"** Trans Union created a direct, insurmountable conflict with Plaintiff's active litigation. In a credit defamation lawsuit involving multiple defendants, proving the liability of the underlying data furnishers (the banks) requires open discovery regarding how those banks transmitted data to Trans Union, how Trans Union handled that data, and what unlawful reporting conduct occurred. If Plaintiff were to sign a contract legally forbidding him from ever disclosing or discussing Trans Union's alleged unlawful conduct to "any person or entity," Plaintiff would be contractually barred from answering deposition questions, responding to interrogatories, providing third-party witness testimony, or exchanging evidentiary disclosures regarding Trans Union's data handling in the companion litigation against Equifax and the data-furnishing banks. Therefore, Paragraph L directly obstructs and paralyzes Plaintiff's active litigation path. Because Trans Union inserted a material restriction that flatly contradicts Plaintiff's express written conditions, no meeting of the minds occurred under Texas law, and the agreement is legally unenforceable.

## VII. CONCLUSION & RELIEF SOUGHT

Plaintiff Robert Stafford acted with absolute good faith, participating in hours of exhausting meet-and-confers, offering major monetary compromises to preserve judicial economy, and tendering a fully signed, conforming contract that Trans Union rejected. Trans Union attempted to leverage a *pro se* consumer's travel schedule to slip toxic, unnegotiated waivers into a federal settlement, and is now throwing an administrative tantrum because Plaintiff read the fine print. No mutual assent occurred regarding Defendant's hidden terms, and no enforceable contract exists.

**PRAYER**

14

WHEREFORE, Premises Considered, Plaintiff Robert Stafford respectfully prays that this Court:

1. **DENY** Defendant Trans Union, LLC's Motion to Enforce Settlement Agreement in its entirety;

2. **DENY** any and all requests by Defendant for attorney's fees, costs, or sanctions; and

3. **ORDER** the parties to immediately proceed with the active litigation docket, including Plaintiff's outstanding Motion to Compel Trans Union's severe discovery violations.

Plaintiff further prays for such other and further relief, both at law and in equity, to which he may show himself justly entitled.

Dated: June 17, 2026

Respectfully submitted,

Robert Stafford
Pro Se

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of June, 2026, a true and correct copy of the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record registered to receive electronic notice in this matter.

Paul L. Myers
Quilling Selander Lownds Winslett & Moser PC
Email: pmyers@qslwm.com
Counsel for Defendant Trans Union LLC
Jennifer R. Brooks
Seyfarth Shaw LLP
Email: jrbrooks@seyfarth.com
Counsel for Defendant Equifax Information Services LLC

Robert Stafford,
Plaintiff Pro Se

15